## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DANIEL LEBOUEF** | **CIVIL ACTION NO.: 21-210** |
| **VERSUS** | **SECTION: "A"(1)** |
| **CROSBY TUGS, LLC** | **DISTRICT JUDGE**<br>**JAY C. ZAINEY** |
| | **MAGISTRATE JUDGE**<br>**JANIS van MEERVELD** |

### OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO
### EXCLUDE THE TESTIMONY AND OPINIONS OF
### CAPTAIN MITCHELL STOLLER

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, Daniel Lebouef, who opposes Defendant's Motion *in Limine* to Exclude the Testimony and Opinions of Captain Mitchell Stoller. Defendant argues that Captain Stoller's opinions are inadmissible because they fail to meet the standards of Rule 702, *Daubert*, would not be helpful to the trier of fact and should be excluded. Defendant's arguments for exclusion are factually and legally deficient, and its Motion should be denied.

## I. FACTUAL BACKGROUND

Plaintiff, Daniel Lebouef, was 55 years of age and had worked for Defendant for nearly 25 years at the time of the incident at issue. During this time, Mr. Lebouef saw little real advancement in his position; he began his career with Defendant as a deckhand and, in large part, remained in the position. At the time of incident at issue, Mr. Lebouef was a deckhand and (unlicensed) engineer.

At the time of the incident at issue, Mr. Lebouef was working with a 4-man crew aboard

1

the M/V CROSBY CRUSADER.  (Ex. A, Banks Dep. 14:24-15:2; Ex. B, Gisclair Dep. 11:12-14.)

At the time, Mr. Lebouef was scheduled for a 28/14 hitch and (allegedly) scheduled for work shifts

of 6/6, meaning working/on watch for 6 hours and then off watch for 6 hours.  (Ex. C, Lebouef

Dep. 71:10-72:17.)  On this hitch, the CRUSADER and its crew were running anchors for a derrick

barge.  (Ex. A, Banks Dep. 15:3-4; Ex. B, Gisclair Dep. 11:15-17.)  The 4-man crew was made up

of Captain Allen Gisclair, Frank Smith (mate/pilot), Levy Banks (deckhand) and Mr. Lebouef

(engineer/deckhand).  (*See* Ex. A, Banks Dep. 14:24-15:2; Ex. B, Gisclair Dep. 13:21-14:4.)  At

times when running anchors, a 5-man crew is used; Captain Gisclair indicated that he always

prefers more guys.  (Ex. A, Banks Dep. 30:22-31:9; Ex. B, Gisclair Dep. 12:14-13:18; Ex. C,

Lebouef Dep. 43:12-44:10, 50:5-14, 56:5-58:22, 129:11-25; Ex. D, Smith Dep. 17:21-18:14.)

Running anchors is a two-man job on the deck.  (Ex. A, Banks Dep. 17:4-11; Ex. C,

Lebouef Dep. 94:2-13.)  When running a 4-man crew, the engineer has to work on the deck.  With

a 5-man crew, there is an additional deckhand to run anchors, and the engineer is able to work the

engine room or perform other tasks (and not run anchors).  (Ex. A, Banks Dep. 31:5-19; Ex. C,

Lebouef Dep. 129:11-25; Ex. D, Smith Dep. 18:11-14.)  When running anchors for a barge, the

barge is the boss.  At any point in the day, if the barge needs assistance, the CRUSADER and its

crew are obligated to make that happen.  There are no set times for rest; any time the barge needs

anchor work performed or assistance with a materials barge or needs to be moved, the

CRUSADER and its crew must jump into action.  (*See* Ex. A, Banks Dep. 18:1-23, 21:2-19, 23:3-

12.)

For this reason, in the hours leading up to the incident at issue, Mr. Lebouef had not rested.

On October 30, 2020, Mr. Lebouef woke at around 6:00 a.m., and was running anchors and

performing other tasks throughout the day.  (Ex. C, Lebouef Dep. 86:9-87:24, 90:1-24, 92:1-17,

96:1-99:2.)  According to the log, the CRUSADER began running anchors at 8 a.m.  Mr. Lebouef was not supposed to begin his watch until noon.  According to Mr. Lebouef and Levy Banks, the deckhand, any time anchors were run, they were performing this task together.  (Ex. A, Banks Dep. 17:4-11; Ex. C, Lebouef Dep. 94:2-13.)  Defendant testified that it recognizes that fatigue management is important, and that if a crew is not properly rested injuries can occur.  (Ex. E, Crosby 30(b)(6) Dep. 62:16-63:18, 73:18-74:6.)

The incident at issue occurred at 12:45 a.m. on October 31, 2020.  At that time, Mr. Lebouef had been working since he woke at 6 a.m. on October 30, 2020, with small breaks but little to no sleep.  (*See* Ex. C, Lebouef Dep. 72:3-73:4, 86:9-87:24, 90:1-24, 92:1-17, 96:1-99:2.)  Mr. Lebouef and Levy Banks had just finishing running anchors – ran anchors from midnight until about 12:30 a.m. on October 31, 2020 – and were in the process of attaching tow lines to move the derrick barge.  (Ex. A, Banks Dep. 24:12-25:11.)  As part of the process, Mr. Lebouef was tasked with throwing a heaving line with a monkey fist to the barge.  (Ex. B, Gisclair Dep. 20:1-15.)

Pursuant to the job safety analysis ("JSA") that was supposed to occur prior to this task, the crewmember throwing the heaving line is supposed to throw the line when the captain positions the vessel and then tells the crewmember to throw the heaving line to the barge.  (Ex. B, Gisclair Dep. 20:8-24:7; Ex. F, Job Safety Analysis Form, dated 10/31/20.)  This policy is in accord with Defendant's testimony that the captain (and mate when serving as captain) is in charge when offshore.  (Ex. E, Crosby 30(b)(6) Dep. 18:13-21.)  Despite the JSA specifically indicating that the captain indicates when the heaving line should be thrown, Banks testified that the captain does not really tell the crewmember when to throw.  (Ex. A, Banks Dep. 30:1-21.)  Mr. Lebouef testified that he throws when the captain tells him.  (*See* Ex. C, Lebouef Dep. 99:22-100:4, 100:21-104:22, 106:1-108:18, 115:1-11, 125:23-129:10.)  Captain Gisclair confirmed that the captain is supposed

to tell the crewmembers when to throw the heaving line, but that, if it is close enough, the crewmember can throw without being told by the captain. (*See* Ex. B, Gisclair Dep. 19:9-20:15; 26:25-29:5.)

The crewmember throwing the heaving line is supposed to use proper throwing technique; however, no one who was deposed was able to define or detail what the proper technique entailed. (Ex. A, Banks Dep. 41:20-22, 46:3-12; Ex. B, Gisclair Dep. 24:8-26:24; Ex. D, Smith Dep. 22:9-24:15; Ex. F, Job Safety Analysis Form.)  The clearest definition of proper technique, which could include sidearm, overhand or underhand throws, was to get the monkey fist to the barge.  (Ex. B, Gisclair Dep. 26:10-24.)

According to Mr. Lebouef, he threw the heaving line when the captain told him to do so. (Ex. C, Lebouef Dep. 99:22-100:4, 100:21-104:22, 106:1-108:18, 115:1-11, 125:23-129:10.) Captain Gisclair testified that, if the vessel was not close enough, he told Mr. Lebouef when to throw the heaving line.  (*See* Ex. B, Gisclair Dep. 19:9-20:15; 26:25-29:5.)  Per Mr. Lebouef, when Captain Gisclair told him to throw the heaving line the CRUSADER was about 40 feet from the derrick barge.  (Ex. C, Lebouef Dep. 99:22-100:4, 100:21-104:22, 106:1-108:18, 115:1-11, 125:23-129:10.)  Mr. Lebouef testified that while he was familiar with throwing a heaving line, throwing a heaving line a distance of 40 feet was abnormal.  (*See id.*)  In the two times that he had to throw a heaving line prior to the incident at issue, the CRUSASER was 10-15 feet from the barge each time.  (*Id.* at 113:22-115:11.)  It was this last throw, which was a distance of 40 feet, that caused him the issue.  (*Id.*)  Mr. Lebouef testified that in his 25-year career with Defendant, he could recall throwing a heaving line 40 feet only about 2 times.  (*Id.* at 111:1-18.)

On Mr. Lebouef's first attempt to throw the heaving line to the derrick barge at the distance of 40 feet, he heard/felt a pop in his shoulder.  Intent on finishing his job, and as the CRUSADER

drew closer to the barge, Mr. Lebouef was able to throw the heaving line to the derrick barge on his third attempt.  (*Id*. at 99:22-100:4, 100:21-104:22, 106:1-108:18, 115:1-11, 125:23-129:10; Ex. B, Banks Dep. 27:22-28:19.)

After this, Mr. Lebouef reported the incident and the injury to his shoulder to Captain Gisclair.  Despite repeated requests to get off the vessel to receive medical treatment, Mr. Lebouef remained on the CRUSADER until crew change occurred on November 4, 2020.  During this time, Mr. Lebouef was still performing work duties, including running anchors.  (Ex. A, Banks Dep. 56:16-25, 63:17-64:6; Ex. C, Lebouef Dep. 143:4-144:13.)  When Mr. Lebouef finally received medical treatment, the injury to his shoulder necessitated surgery.

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 governs testimony of expert witnesses.  In relevant part, Rule 702 provides that "a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise" so long as "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue," "the testimony is based on sufficient facts or data," and "the testimony is the product of reliable principles and methods."  The court must "mak[e] a preliminary assessment of whether the reasoning or methodology underlying the [expert's] testimony is scientifically valid and . . . can be applied to the facts in issue."  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (*quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993)).  This preliminary assessment is known as the court's gatekeeping role, and applies to expert testimony whether it is scientific or not.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

Even considering *Daubert*, courts understand that the "rejection of expert testimony is the exception and not the rule." *Johnson v. Samsung Electronics America, Inc.*, 277 F.R.D. 161, 165 (E.D. La. Sept. 14, 2011) (*citing* Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments). The court's role as gatekeeper "does not replace the traditional adversary system and the place of the jury within the system." *Scordill v. Louisville Ladder Group, LLC*, 02-2565, 2003 WL 22427981, at *3 (E.D. La. Oct. 24, 2003). As to the admissibility of expert testimony, the Fifth Circuit has noted that the trial court must defer to "the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.* at *3 (*quoting United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)).

Further, pursuant to Federal Rule of Evidence 703, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." "An expert can rely upon otherwise inadmissible evidence as long as it is of a type 'reasonably relied upon by experts in the particular field.'" *Nat'l Union Fire Ins. Co. v. Smith Tank & Steel, Inc.*, 11-830, 2014 WL 5794952, at *4 (M.D. La. Nov. 6, 2014) (*quoting* Fed. R. Evid. 703); *Howard v. Offshore Liftboats, LLC*, 13-4811, 2016 WL 483164, at *2 (E.D. La. Feb. 5, 2016). A court is only concerned with whether, based on a preponderance of the evidence, the expert's opinion is reliable, not whether the opinion is correct. *Howard*, 2016 WL 483164, at *1.

When determining the admissibility of expert testimony, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "Simply disagreeing with the underlying facts relied on by an expert is not grounds for excluding the expert under *Daubert*." *Martinez v. Offshore Specialty Fabricators, Inc.*, No.

08-4224, 2011 WL 820313, at *3 (E.D. La. Mar. 2, 2011).

## III.   LAW AND ANALYSIS

### A. Specialized Knowledge Not Within Common Understanding of Jury

Defendant argues that Captain Stoller's opinions are not scientific or based on specialized knowledge and that this is a straightforward case involving evidence that the jury is fully capable of understanding.

<u>*Stoller is Qualified Based on Education, Experience and Training*</u>

To qualify as an expert, "the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)).  Additionally, Rule 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education." *Hicks*, 389 F.3d at 524; *see also Kumho Tire Co.*, 526 U.S. at 147 (discussing witnesses whose expertise is based purely on experience).  "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir. 1999)).

However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue.  Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citing *Daubert*, 509 U.S. at 596).  "A lack of specialization should generally go to the weight of the evidence, rather than its admissibility." *United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013).  "[V]igorous cross-examination, presentation of contrary evidence, and

careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596). "Thus 'an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight.'" *Id.* (quoting *Wheeler v. John Deere Co.,* 935 F.2d 1090, 1100 (10th Cir. 1991)).

According to Captain Stoller's report (*see* Ex. G, Stoller Report at 1) and Curriculum Vitae (*see* Ex. H, Curriculum Vitae at 8), he graduated as Valedictorian from the California Maritime Academy in 1975. Since then, he has also completed many post-graduate maritime training and safety courses. Captain Stoller is a licensed, unlimited ships master. (Ex. G, Stoller Report at 1.) He is experienced in navigation and towing safety, supervising deck operations, human factors in maritime accidents related to fatigue and, through his training and experience, he is very familiar with industry best practices related to risk analysis and maintaining onboard ship safety. (*Id.* at 1-2.)

Since 1991, Captain Mitchell Stoller has provided expert maritime safety testimony in state and federal courts, and has testified in over 600 depositions. (Ex. H, Curriculum Vitae at 7.) The opinions set forth in his report are within the bounds of his vast maritime expertise, even if not scientific, as the law and jurisprudence permit. Thus, Captain Stoller is a qualified expert witness on the marine safety issues presented in this case.

### *These Maritime Issues are Not Within the Jury's Common Understanding*

To the extent that Defendant assumes that Captain Stoller's testimony would focus on the mechanics of Mr. Lebouef throwing a heaving line, it is mistaken. This is the false narrative at the center of its argument that the maritime issues involved in this case are within the common understanding of the jury.

Generally, seagoing conditions, marine terminology, and the unique dangers that seamen face are not within the common knowledge of the jury. Specifically, the duties and responsibilities of a captain are elements of the maritime industry that are not within the common knowledge of a jury. (*See* Ex. G, Stoller Report at 16.) The immense responsibility of the captain as the top safety officer on board a vessel, and the breadth of his authority, is uncommon to shore-based workers, who are likely to be prevalent on a jury. (*Id*.) The requirement that the captain ensure the the safety of his crew by being knowledgeable of safety rules, policies and standards, and his obligation to take steps to ensure that safety standards are adhered to, such as performing job safety analyses before sending crewmembers out to perform tasks, are topics that are not within the common knowledge of the jury. (*See* Ex. G, Stoller Report at 14-16.) Additionally, the non-governmental programs that account for many of the customs and standards applicable to maritime vessel owners, and the obligations on the shoreside leadership of a company to adhere to these programs, are also topics not within a jury's common understanding. (*Id*. at 8-11.) Further, human factor accidents/injuries in the maritime industry and their relation to fatigue and the "12-hour rule" are also likely to be foreign to jurors. (*Id*. at 2-3, 9-10.)

These are the topics that will be central to Captain Stoller's testimony. His wealth of knowledge and experience, from over 40 years in the marine industry as a mate, master, consultant, committee member on various safety commissions and expert witness, will surely be helpful to the jury in understanding the safety standards that are expected aboard a vessel, applicable to the vessel owner, and the ways in which Crosby's actions fell below said standards. (*See* Ex. G, Stoller Report at 1-3; Ex. H, Curriculum Vitae).

Defendant's attacks upon various portions of Captain Stoller's report as "nonsensical" and "factually incorrect" as relate to maritime industry standards is a clear indication of disagreement

with Captain Stoller's opinions as to industry norms and customs.  However, disagreeing with an expert is not grounds for exclusion under *Daubert*.  *See Martinez*, No. 08-4224, 2011 WL 820313, at \*3.  Moreover, Captain Stoller's recitation of facts presented to him in documentary evidence and deposition testimony is a demonstration that his opinions are informed by, and not divorced from, the facts in this case.  *See* Fed. R. Evid. 702(b) (requiring that expert testimony be "based on sufficient facts or data."); *Wilcox*, No. 12-2389, 2013 WL 4517907, at \*1 (reasoning that expert testimony is not based on sufficient facts or data when it lacks an evidentiary basis or factual support).

Defendant's reliance on *Alvarado v. Diamond Offshore Mgmt. Co*., C.A. No. 11-25, 2011 WL 4948031 (Oct. 18, 2011), in support of its argument is misplaced.  In *Alvarado*, the whole of the expert's testimony was going to be the violation of regulations and whether a particular lift was unreasonably dangerous.  *Id*. at \*3.  In this case, Plaintiff intends for Captain Stoller to discuss the industry standards, customs and practices related to a company and a captain's role in risk analysis and policy enforcement, and human factor accident/injuries in the maritime industry and their relation to fatigue and the 12-hour rule.  *See supra* 8-9.  These are topics not within the common knowledge of the jury, and will assist the trier of fact.

As shown, Captain Stoller is qualified and his testimony will be helpful to the trier of fact; his testimony and opinions should not be excluded and Defendant's Motion should be denied.

## B.  Legal Opinions Will Not Be Offered

Plaintiff acknowledges that expert testimony cannot include conclusions of law.  However, Plaintiff avers that an expert's testimony about an industry standard and whether certain acts or omissions are in compliance with said standard is not automatically causation testimony.  *See* Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue.").  While

questioning that would tell the jury what to do (e.g., a question asking what the cause of an accident was or who was negligent) or that clearly elicits nothing more than legal conclusions is not permissible, obtaining an expert's knowledge on the subject of his expertise that may broach an issue that will be put before the jury is not out of bounds. *See Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) (reasoning that Federal Rule of Evidence 704 abolished the per se rule against testimony regarding ultimate issues of fact, and that proper questioning is can result in permissible testimony on an ultimate issue by an expert).

### C. Safety Analysis and Safety Meetings

Defendant next argues that any testimony by Captain Stoller related to safety analysis related to the task of throwing the heaving line would be irrelevant and not helpful to the jury. Defendant attempts to get this Court to see the trees and ignore the forest.

In his report, Captain Stoller discusses a ship owner's and captain's responsibility related to safety requirements and establishing safety procedures. Related to passing lines such as a heaving line, he notes that, per industry customs and standards, it is important to conduct risk assessments related to known or recognized hazards, such has passing heaving lines. (*See* Ex. G, Stoller Report at 10-11.) Proper risk assessment allows ship owners and captains to identify hazardous practices and formulate alternate methods so that safe techniques can be established and passed along to crew members through training. (*Id*. at 11-13.) This allows for risks to be mitigated, and accidents and injuries to be prevented. (*Id*.)

Based on the facts in this case, the issue is not just whether a safety meeting was conducted, it is the deficiency in the policy and training. The separate understandings/takes on the JSA and whether the captain tells the crewmember to throw the line, despite its clear wording, is clearly a training issue for Defendant. *See supra* at 3-4. Moreover, there are two clear deficiencies in the

11

policy that are evident:  1) there is no distance indicated as to how far the vessel can be from the barge before the captain tells the crewmember to throw the line; and 2) there is no definition or understanding of what is a proper throwing technique.  (*See* Ex. F, Job Safety Analysis Form; *see also supra* at 4.)  A proper analysis of either of these risks/deficiencies evident in the policy, along with the establishment of safe practices based on the analysis, would have prevented Plaintiff's incident and injury.  The testimony of Captain Stoller about the industry customs practices, and the obligations they place on Defendant and its captains related to risk analysis, is vital to the jury's understanding of this issue.

Further, the mentality of a seaman and his obligation to obey the captain, is also an issue in this case.  Plaintiff repeatedly testified that he threw the heaving line because the captain told him to do so.  (Ex. C, Lebouef Dep. 99:22-100:4, 100:21-104:22, 106:1-108:18, 115:1-11, 125:23-129:10.)  Defendant attempts to argue that Plaintiff should have used "common sense" and not thrown the heaving line when ordered by the captain.  In response, Plaintiff avers that it is important for the trier of fact to understand the difference between an instruction from a shore-based boss and the captain of a vessel at sea.  (Ex. G, Stoller Report at 16.)  This difference is unique to the maritime industry and not within the common knowledge of the jury.  (*Id*.)  Captain Stoller's testimony on this issue will be immensely helpful to the trier of fact on this issue and should not be excluded.

### D.  Manning Requirements

Plaintiff does not intend to seek testimony on purely factual issues from Captain Stoller.  Again, though his report encompasses facts from documentary evidence and deposition testimony that he reviewed, that is not the opinion testimony that Plaintiff will seek to elicit.  However, Defendant's argument that the size of the crew and that Plaintiff's fatigue/lack of sleep are

irrelevant to this case are simply untrue. Plaintiff repeatedly testified about how he was on watch all the time and could not get any sleep because they were running anchors. (*See* Ex. C, Lebouef Dep. 72:3-73:4, 86:9-87:24, 90:1-24, 92:1-17, 96:1-99:2.) Further, Defendant specifically testified that fatigue can lead to injuries. (Ex. E, Crosby 30(b)(6) Dep. 62:16-63:18, 73:18-74:6.) As Plaintiff laid out in detail in his *Opposition to Defendant's Motion for Partial Summary Judgment*, the excessive hours that Plaintiff was working absolutely are relevant and played a part in Plaintiff's incident and injury.[1] As for how having another man would have played a part in preventing Plaintiff's injury, put simply, having another man on the vessel would have allowed for Plaintiff to have more rest and alleviate the risk of injury associated with fatigue. Based on his knowledge and experience, Captain Stoller can provide testimony on human factor accidents in the maritime industry and how they relate to fatigue and the 12-hour rule. (Ex. G, Stoller Report at 2-3, 9-10.) Captain Stoller's testimony on this issue would not be irrelevant or speculative as it relates directly to the evidence and a claim being pursued by Plaintiff; his testimony should not be excluded.

### E. Medical Testimony

To the extent that Captain Stoller's report includes medical diagnosis information and/or medical causation information, Plaintiff will not be seeking his testimony on this at trial.

## IV.  <u>CONCLUSION</u>

For these reasons, the Motion *in Limine* to Exclude Testimony and Opinions of Captain Mitchell Stoller should be denied.

---

[1] Plaintiff incorporates by references the section in his *Opposition* that addresses "excessive working hours" on pages 12-14.

Respectfully submitted:

_____

**C. ARLEN BRAUD, II, #20719**
**MICHELLE O. GALLAGHER, #23886**
**STEVEN D. JACKSON, #35841**
Braud & Gallagher, L.L.C.
111 N. Causeway Blvd., Ste. 201
Mandeville, LA 70448
Telephone:      (985) 778-0771
Facsimile:      (985) 231-4663
arlenb@braudandgallagher.com
michelleg@braudandgallagher.com
stevenj@braudandgallagher.com
*Counsel for Plaintiff, Daniel Lebouef*

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2022, I electronically filed the foregoing with the clerk of court by using the CM/ECF system which will send a notice of electronic filing to all counsel.

_____
STEVEN D. JACKSON

14